UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| TTAC Publishing, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action File No. 3:20-cv-00696 |
| | ) | |
| | ) | |
| v. | ) | JUDGE RICHARDSON |
| | ) | MAGISTRATE JUDGE FRENSLEY |
| TATC Publishing, LLC; Jonathan Hunsaker; | ) | |
| Jeff Hays; Manny Goldman; and Patrick | ) | JURY DEMAND |
| Gentempo. | ) | |
| | | |
| Defendants. | | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff TTAC Publishing, LLC (hereinafter referred to as "TTAC" or "Plaintiff") files

this Memorandum in Support of its Motion for Temporary Restraining Order and Preliminary

Injunction showing this Court as follows:

## I. INTRODUCTION

TTAC's Motion for Temporary Restraining Order and Preliminary Injunction arises from

Defendants' adoption and use of THE ANSWER TO CANCER mark, which is confusingly similar

to TTAC's federally registered trademark, THE TRUTH ABOUT CANCER®, and Defendants'

adoption and use of a logo that is a near duplicate of TTAC's logo, which has been in continuous

and exclusive use since 2014. The infringements are no coincidence; Jonathan Hunsaker was a

prior member of TTAC Publishing, LLC, and Manny Goldman was its marketing guru until a 2018

1

business divorce left TTAC's developers, Ty and Charlene Bollinger, as sole owners. Little more than a year later, Hunsaker and Goldman used their intimate knowledge of TTAC's registered trademark, logo, business model, marketing strategies, and customer base to create a copycat business designed to trade off of TTAC's reputation and goodwill.

In furtherance of this goal, Defendants: (1) created a business entity with a confusingly similar name (TATC Publishing, LLC v. TTAC Publishing, LLC); (2) adopted a confusingly similar mark and logo copying the TTAC's mark and its logo's font, typeface, color, layout, and overall design; (3) copied TTAC's business and marketing strategies; (4) utilized the same marketing channels to produce and market a similar but inferior product to TTAC's consumer base; and (5) promoted TATC as having an affiliation with TTAC. Indeed, TATC's sole business model is to create the false impression that TTAC is now doing business as TATC or that TTAC sponsors, endorses, or is otherwise affiliated with TATC. As a result of Defendants' actions, TTAC has suffered and will continue to suffer irreparable harm, including, but not limited to, injury to its reputation and goodwill.

Given Defendants' misconduct, the continuing irreparable harm to TTAC, and the substantial likelihood of TTAC's success on the merits, TTAC is entitled to a restraining order that enjoins Defendants from using, promoting, or otherwise marketing THE ANSWER TO CANCER mark and logo and that requires them to publicly disclaim any affiliation with TTAC. A proposed order is filed herewith for the Court's consideration.

## II.     FACTUAL BACKGROUND

### A.     TTAC Publishing, LLC's Creation and The Use of THE TRUTH ABOUT CANCER Mark and Logo in TTAC's Brand Development

Following the loss of both parents and five additional family members to cancer, Ty

2

Bollinger was inspired to learn about cancer prevention and the efficacy of traditional and alternative cancer treatments. (Affidavit of Ty Bollinger ("Bollinger Aff.") ¶ 4, attached hereto as **Exhibit 1**). Along with his wife, Charlene, and former business partner Jonathan Hunsaker, Ty created TTAC Publishing, LLC—known publicly as "The Truth About Cancer." (Bollinger Aff. at ¶ 5). Through years of hard work and focused research, TTAC is now an industry leader specializing in the creation and dissemination of healthcare information related to cancer and its prevention and treatment. (*Id.* at ¶ 6)

As early as 2014, TTAC began marking its products and services under the trademark THE TRUTH ABOUT CANCER, which the United States Patent and Trademark Office registered to TTAC on November 14, 2017. (*See id.* at ¶ 7 and at Ex. A thereto, TTAC Trademark Registration No. 5,332,359. Additionally, TTAC has continuously and exclusively used the THE TRUTH ABOUT CANCER logo in connection with marketing its products since 2014. (*Id.* at ¶ 10)

In developing and implementing THE TRUTH ABOUT CANCER and logo, TTAC has expended considerable time and resources to develop the goodwill and reputation the public has come to associate with TTAC and its products and services. (*Id.* at ¶ 10). TTAC and its owners have authored books, created and released multiple docuseries, and published valuable information about cancer treatment and prevention via various social media outlets. (*Id.* at ¶ In 2006, Ty Bollinger authored "Cancer—Step Outside the Box," a book that sold more than 250,000 copies and is currently in its sixth edition. (*Id.* at ¶ 11). In 2016, TTAC released a second book entitled "The Truth About Cancer," which ultimately ranked #2 on the New York Times Bestseller list in November of 2016. (*See id.* at Ex. B, Printout of New York Times Bestseller List, Nov. 13 2016,

available at https://www.nytimes.com/books/best-sellers/2016/11/13/health/ (last visited on September 10, 2020)).

From 2014 to 2016, TTAC created, marketed and released a multi-part docuseries that discussed the truth about cancer prevention and treatment options—both traditional and alternative. (Bollinger Aff. ¶ 13). The docuseries follows Ty as he travels the country and interviews doctors, researchers, experts, and cancer survivors about various methods for preventing and treating cancer. (*Id. at* ¶ 13). The Truth About Cancer docuseries was extremely successful, and TTAC's docuseries have been viewed by as many as 20,000,000 viewers. (*Id.* at ¶ 14). Following the success of that docuseries, TTAC continued to educate consumers through its healthcare literature and products. (*Id.* at ¶ 15).

Additionally, TTAC has a large social media presence where it interacts with more than a million current and potential customers. Currently, TTAC's Instagram page has approximately ninety-two thousand (92,000) followers. (*See id.* at ¶ 17 and at Ex. C thereto, Printout of The Truth About Cancer Instagram, available at https://www.instagram.com/thetruthaboutcancerttac/?hl=en (last visited September 8, 2020)). The Truth About Cancer Facebook page has 1,141,051 people who "like" the page and 1,154,185 people who "follow" the page. (*See id.* at Ex. D thereto, The Truth About Cancer Facebook, available at https://www.facebook.com/thetruthaboutcancer/?ref=page_internal (last visited September 8, 2020)). Indeed, TTAC routinely provides the public with educational information on various social media websites, and TTAC's products, services, promotional materials, Facebook page, Instagram account, and company website prominently display THE TRUTH ABOUT CANCER mark and logo. (*Id.* at ¶ 16).

4

TTAC's years of experience and persistence have earned it a reputation for being trustworthy, honest, and knowledgeable, and for providing authentic, well-researched information to the consumer. (*Id.* at ¶ 19). TTAC's well-earned reputation and goodwill are evident from the public's feedback:



(Bollinger Aff. at Ex. E thereto, August 21, 2020 Screenshot of The Truth About Cancer Facebook Reviews Page, https://www.facebook.com/thetruthaboutcancer/reviews/?ref=page_internal); *see also id.* at Ex. F thereto, September 10, 2020 Screenshot of The Truth About Cancer Facebook "Photos," available at

5

https://www.facebook.com/thetruthaboutcancer/photos/a.671302802963032/3182017255224895 (comments about the photos demonstrating TTAC's reputation)).

## B. Defendants' Prior Affiliation with TTAC Gave Them Unrestricted Access to TTAC's Business Model, Marketing Strategies, and Customer Lists

Defendants were fully engaged with TTAC and its marketing and sales efforts from 2014 to 2018. (*See* Bollinger Aff. ¶ 20). From its formation and throughout its brand development Jonathan Hunsaker was a member of TTAC as well as its Chief Marketing Officer. (*Id.* at ¶ 21). And from 2015 to 2018, Manny Goldman was engaged as TTAC's "Director of Traffic" to implement TTAC's marketing plans. (Bollinger Aff. ¶ 22). In these roles, Hunsaker and Goldman were intimately familiar with TTAC's business model and marketing strategies, and they were privy to TTAC's confidential newsletter list of more than 2 million people. (*Id.* at ¶ 23). Indeed, Defendants had virtually unrestricted access to TTAC's business and marketing strategies and were intimately involved in TTAC's utilization of its trademarks to develop its reputation and goodwill. (*Id.*)

Moreover, Defendants knew that TTAC's use of THE TRUTH ABOUT CANCER mark and logo were key elements of its marketing efforts and brand development. (*Id.* at ¶ 24). Defendants witnessed TTAC's success and knew that the TTAC brand secured more than $25,000,000 in customer transactions since 2014. (*Id.* at ¶ 25).

As TTAC's success grew, the relationship between Jonathan Hunsaker and the Bollingers deteriorated, and they eventually entered into a Securities Redemption Agreement, which divested Hunsaker of any ownership or interest in TTAC effective August 1, 2018. (*Id.* at ¶ 26). As a result, the Bollingers are now the sole owners of TTAC, its trademarks and its goodwill. (*Id.* at ¶ 27).

6

**C.     TATC Publishing, LLC is Formed, Structured and Marketed to Trade Off of TTAC Publishing, LLC's Goodwill and Reputation**

In January 2020—little more than a year after his separation—Hunsaker, along with Defendants Manny Goldman, Jeff Hays, and Patrick Gentempo, formed TATC Publishing, LLC—publicly known as "The Answer to Cancer," which is nearly identical to "The Truth About Cancer" in its name, acronym, mark, logo, and business model. (*Id.* at ¶ 28). Indeed, the formal business name "TATC Publishing, LLC" transposes a single letter in TTAC Publishing, LLC's name so that it is confusingly similar. Moreover, THE ANSWER TO CANCER mark being used by TATC is confusingly similar to TTAC's registered mark, THE TRUTH ABOUT CANCER.

Equally as egregious—and creating further confusion between TATC's mark and TTAC's registered mark—TATC promotes its mark using a logo that infringes upon TTAC's unregistered logo, which has been in continuous use since 2014. (Bollinger Aff. ¶ 29). Compare the fonts, typefaces, colors, layouts and overall designs of the following:

 

(*See id.* at ¶¶ 8, 29).  From a side-by-side comparison it is apparent that Defendants' intentionally and knowingly copied TTAC's mark and logo to deceive consumers into confusing the two companies or believing an affiliation or connection exists between the platforms.

Not only did Defendants copy TTAC's name, acronym, and logo, they copied TTAC's business model—further enabling them to trick the consuming public into believing that TATC is

7

4830-9230-2794v3
2938205-000015 09/11/2020

TTAC or that TATC is sponsored by or affiliated with TTAC. (*Id.* at ¶ 30). Indeed, TATC recently launched and is currently promoting a nine-part docuseries providing information about cancer, cancer prevention, and cancer treatment, which launched on August 4, 2020. (*Id.* at ¶ 31; *see also* **Exhibit 2**, Printout of Defendants' The Answer to Cancer Website, available at https://theanswertocancer.com/jv/ (last visited September 10, 2020)). TATC's plagiarism of TTAC's name, acronym, logo, and business model was intentional and designed to allow TATC to trade off of TTAC's hard-earned reputation and goodwill in order to bolster its competing docuseries. (Bollinger Aff. ¶ 32).

**D.     TATC's Copycat Docuseries, Product Marketing, and Misrepresentations as to Its Affiliation with TTAC**

But TATC even went beyond creating and using a confusingly similar mark and logo. Defendants have created a copycat docuseries about cancer treatment and prevention and have repeatedly promoted and marketed TATC and its docuseries as being affiliated with TTAC. (Bollinger Aff. ¶ 33). Indeed, its representations have caused reviewers of the docuseries to associate the two companies and products and confusion in the marketplace continues to spread. (*Id.*)

Initially, TATC's website touted Hunsaker's prior membership in TTAC and Goldman's prior employment by expressly referencing their involvement in the TTAC docuseries without mentioning that they are no longer affiliated with TTAC. (*Id.* at ¶ 34). Specifically, the website misrepresented that Hunsaker was the "creator" of TTAC's The Truth About Cancer docuseries, stating, "The chief marketer behind The Answer to Cancer is the same marketer who created, built and marketed The Truth About Cancer." (*See id.* ¶ 34 *at* Ex. G thereto, April 10, 2020 Screenshot of Information Formerly Included on "About" Page on TheAnswertoCancer.com at

8

https://theanswertocancer.com/jv/). As to Goldman, the website states, "As the Director of Traffic for The Truth About Cancer, from January, 2015 - June, 2016, Manny helped them go from 100,000 subscribers to 2,000,000 and from $2M in revenue to $25M. This was all with 3 launches within 18 months." (*See id. at* Ex. H thereto, The Answer to Cancer FAQ Page, available at https://theanswertocancer.com/faqs/?orid=880&opid=4&sid=jv070720 (last visited September 10, 2020)).

TATC even promoted the docuseries as the next iteration of THE TRUTH ABOUT CANCER docuseries by stating that TATC's docuseries is "the next level to the legacy and movement that Jonathan Hunsaker created The Truth About Cancer. Think of it as 2.0 :-)." (*See id.* at ¶ 36 and at Ex I thereto, March 24, 2020 Screenshot of Information Previously Included on TheAnswertoCancer.com "Launch" at https://theanswertocancer.com/launch/).

Although Defendants have since removed the aforementioned references from the TATC website, the damage is done and TATC continues to mislead the public into believing that the TATC docuseries is an updated version or continuation of TTAC's The Truth About Cancer docuseries as evidenced on various websites. For example, in an article currently available at www.advancedliving.com, TATC's docuseries is touted as one that "follows in the footsteps of Jonathan Hunsaker's The Truth About Cancer." (*See id.* at Ex. J thereto, Printout of "The Answer to Cancer: Watch the Powerful Documentary Series," available at https://www.advancedliving.com/the-answer-to-cancer/ (last visited September 10, 2020)). The article then falsely promotes TATC's docuseries as a more recent version of the TTAC docuseries, stating, "Jonathan Hunsaker has teamed up with a new crew to launch ***2020's version of his documentary***: The Answer to Cancer." (*Id.* (emphasis added)).

9

As another example of the irreparable harm TTAC is suffering because of Defendants' continued misrepresentations, an article promoting the release of The Answer to Cancer docuseries entitled, "The Answer to Cancer Review: New Health Documentary Series to Launch," expressly references TTAC's The Truth About Cancer in its promotion of TATC's The Answer to Cancer, implying that TATC's docuseries is the follow up to TTAC's docuseries:

## A Closer Look at the Project

Many of our readers may remember that The Truth About Cancer (TTAC) was a three-part docuseries that aired across a host of mainstream media avenues from 2014-2016. As part of the documentary, its creators explored in detail a number of traditional, cost-effective methods of treating cancer as well the various ways in which western healthcare systems are repeatedly exploiting their patients by keeping them bound to different drugs and medicines, the profits from which run into the trillions.

Additionally, TTAC also investigated the underbelly of the global medical mafia and how many individuals suffering from cancer are forced to stay bound to certain treatment methods for years on end just because hospitals, doctors and medicine manufacturers stand to make vast amounts of profits from the pain, suffering and misery of their patients.

### What is The Answer to Cancer?

As with TTAC, The Answer to Cancer also seeks to help educate cancer patients about the truth behind this disease as well as the various treatment options, both traditional and alternative, that are available in the market today. To be a bit more specific, The Answer to Cancer is a 9-part docuseries that features a number of detailed, insightful interviews from doctors, experts and patients who share their personal experiences of dealing with cancer and the various treatment methods and protocols they have employed to cure themselves of the disease.

(*See* **Exhibit 3** Printout of The Answer to Cancer Review, available at https://timesofhealth.com/the-answer-to-cancer/ (last visited September 10, 2020)).

Those articles are only two examples of misinformation being provided to the public in conjunction with Defendants' intentional utilization of a similarly confusing mark and logo. Indeed, if Defendant did not direct the comparisons and references to TTAC in these articles, they

10

demonstrate that the similarity between TATC's mark and logo and TTAC's mark and logo causes the public to associate the two companies.

Most importantly, these misleading references to TTAC are disseminated to the public as search results when a Google search is performed for the term, "The Answer to Cancer." Indeed, the search results provide at least five other websites expressly or impliedly misrepresenting an affiliation, connection, association with, sponsorship of TATC by TTAC, or that the TATC docuseries is a new version of the previously released TTAC's docuseries:

1. http://jointventures.jvnotifypro.com/2020/03/03/jonathan-hunsaker-jeff-hays-dr-patrick-gentempo-the-answer-to-cancer-launch-affiliate-program-jv-invite-more/

2. https://www.advancedliving.com/the-answer-to-cancer/

3. https://mindfulnesscore.com/the-answer-to-cancer-review/

4. https://timesofhealth.com/the-answer-to-cancer/

These websites prominently display TATC's infringing mark and logo; reference TTAC's prior docuseries and imply an affiliation between the two entities; and falsely tout Jonathan Hunsaker as the creator of both docuseries. True and correct copies of the articles posted at the above-listed Internet addresses, as they appear on September 10, 2020, are attached collectively as **Exhibit 4**.

And TATC's deceptive business practices and marketing strategies are working. TTAC has received numerous emails and communications from its clients who have been deceived into believing that TATC and TTAC are one in the same or are affiliated. (Bollinger Aff. ¶ 38). For example, people have stated:

- "I just signed up for Answer to Cancer, and thought it was your videos. Are you related to these videos?"

11

- "Are you aware of this knock off docuseries? It was shared by a friend who said it's the new and updated version of TTAC. I thought you might want to send a word out to warn people."

- "I'm wondering why you're running this at the same time as The Answer to Cancer. This is too much information for one time period."

- "The Answer to Cancer series is playing now & it's long. . . . But it's great too, like all of your series! Thanks for all you do!"

(*See id.* at Ex. K, Consumer Emails Received by TTAC)

In short, TATC used knowledge of TTAC's business plan, marketing strategies, products, and the reputation and goodwill associated with TTAC's mark and logo to create a business with a nearly identical name, mark, and logo to market copycat products to TTAC's consumer base. And by expressly referencing TTAC in its online promotions of TATC's products, a wave of confusion as to the two companies' products and affiliations has spread to product review websites and to TTAC's customers. (Bollinger Aff. ¶ 39). As set forth below, an injunction is warranted and necessary to mitigate the irreparable harm that TTAC has suffered and will continue to suffer because of Defendants' actions.

### III.    <u>ARGUMENT AND DISCUSSION OF AUTHORITY</u>

When considering a motion for a temporary restraining order or preliminary injunction, the Court must consider four factors: (1) whether the movant is likely to succeed on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *Ohio Republican Party v. Brunner*, 543 F.3d 357, 362 (6th

12

Cir. 2008). These four considerations are "factors to be balanced, not prerequisites that must be met." *Jones v. City of Monroe, MI*, 341 F.3d 474, 476 (6th Cir. 2003), *abrogated on other grounds by Hindel v. Husted*, 875 F.3d 344 (6th Cir. 2017). Specific findings concerning each of the four factors is not required "in determining a motion for preliminary injunction if fewer factors are dispositive of the issue." *Id.* In the present case, however, all four factors weigh in TTAC's favor.

## A. TTAC Will Likely Succeed on the Merits of Its Claims

The first factor the Court must consider is whether Plaintiff has demonstrated a "strong likelihood of success on the merits." *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005) (citation omitted). A party is not required to prove his case in full at a preliminary injunctive hearing. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). "[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *In re DeLorian Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

Relevant to this Motion, TTAC has brought the instant action against Defendants for trademark infringement arising under the Lanham Act, *contra* 15 U.S.C. §§ 1114(1) and 1125(a); Tennessee Trademark Infringement, TCA § 47-25-512; and Common Law Tennessee Unfair Competition. TTAC is likely to prevail on the merits of each of these claims. Accordingly, this factor weighs in favor of granting TTAC's request for injunctive relief.

### 1. Defendants' Have Infringed TTAC's THE TRUTH ABOUT CANCER Trademark and Logo and Engaged in Unfair Competition

The Lanham Act provides protection against trademark infringement and a wide range of activities that are generally called "unfair competition." *See Parameter Driven Software, Inc. v. Massachusetts Bay Insur. Co.,* 25 F.3d 332, 336-337 (6th Cir. 1994) (listing examples of actions

13

constituting unfair competition). To prevail on its claim of trademark infringement under the Landham Act, TTAC must establish that TATC

> use[d] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114(a)(1). Additionally, a cause of action for trademark infringement under § 1114 requires ownership of a federal registration for the trademark at issue. *Sovereign Order of Saint John of Jerusalem, Inc. v. Grady*, 119 F.3d 1236, 1242 (6th Cir. 1997).

Unfair competition is established under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), if the Defendant

> in connection with any goods or services, or any container for goods, uses in commerce any word term, name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .

15 U.S.C. § 1125(a)(1)(A). One form of unfair competition under § 1125(a)(1)(A) is infringement of a common law trademark (also known as "passing off"). *See also Sovereign Order*, 119 F.3d at 1243 ("passing off" is also unfair competition under Tennessee law). "Passing off" occurs when one represents that its goods are those of another, usually a competitor, or substitutes its goods for those of another. *See Federal-Mogul-Bower Bearings, Inc. v. Azoff*, 313 F.2d 405, 409 (6th Cir. 1963).

Another type of unfair competition that falls within §1125(a)(1)(A) is false designation of origin and false description. Such a claim must meet two elements: "(1) the false designation must have a substantial economic effect on interstate commerce; and (2) the false designation must

14

create a likelihood of confusion." *Johnson v. Jones,* 149 F.3d 494, 502 (6th Cir. 1998). "Origin" in the Lanham Act does not merely refer to geographical origin, but also includes origin of source or manufacture. *Federal-Mogul-Bower Bearings¸* 313 F.2d at 408. "A description of origin will be considered false if it creates a likelihood of confusion in the consuming public." *Johnson*, 149 F.3d at 502.

Claims for trademark infringement and unfair competition under Tennessee law also require a use in Tennessee and a likelihood of such use to cause confusion. *Men of Measure Clothing, Inc. v. Men of Measure, Inc*., 710 S.W.2d 43, 48–49 (Tenn. Ct. App. 1985).

      a.      ***Defendants' use of THE ANSWER TO CANCER mark and logo is "use in commerce" for the purpose of trademark infringement and unfair competition.***

In the context of trademark infringement and unfair competition, a defendant uses the trademark "in commerce" anytime it is used in connection with the offering for sale of goods or services in interstate commerce. *See* 15 U.S.C. § 1127 (defining "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark"). A mark is used in commerce "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services." 15 U.S.C. § 1127.

TATC's use of the confusingly similar THE ANSWER TO CANCER mark and logo in connection with the promotion of its products and services over the Internet, including The Answer to Cancer docuseries, meets the requisite "use in commerce" element for a finding of trademark infringement and unfair competition under the Landham Act and Tennessee law. The use of a mark

15

in connection with the "dissemination of information over the Internet satisfies the 'use in commerce' requirement." *Savannah College of Art and Design, Inc. v. Houeix*, 369 F.Supp.2d 929, 944 (S.D. Ohio 2004) (citing case authority from multiple jurisdictions). Although Defendants market The Answer to Cancer docuseries as a free production, it's designed to generate sales through direct solicitation during the docuseries:

Q: Is The Answer to Cancer completely free?

A: The original documentary series is free. Users only need to sign up to attend the series. While the documentary is being aired, users will have the chance to buy additional items and resources related to the document and its contents. The total value of these items will be around $279, although we speculate that the event will offer discounts pretty frequently at the event.

(*See* Bollinger Aff. at Ex. J). Both THE ANSWER TO CANCER mark and logo are being used in interstate commerce to promote and market TATC's copycat products and services. (*See Id.*). Accordingly, the "use in commerce" requirement is met.

> **b.** ***Defendants' use of THE ANSWER TO CANCER Mark and Logo Will Cause and Has Already Caused Confusion.***

"The touchstone of liability for trademark infringement is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Hensley Mfg. v. ProPride, Inc*., 579 F.3d 603, 610 (6th Cir. 2009) (quotation marks and citation omitted). Once use in commerce is established, a plaintiff need only show a likelihood of confusion to prevail on its trademark infringement and unfair competition claims under 28 U.S.C. § 1114, 28 U.S.C. § 1125(a), and Tennessee common law. *See Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 381 n. 6 (6th Cir. 2006); *Johnson*, 149 F.3d at 502; *Frisch's Rest., Inc.  v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 647 (6th Cir. 1982); *Men of Measure Clothing*, 710 S.W.2d at 48–49 (holding that Tennessee common law

16

trademark infringement are essentially identical to their federal counterparts in that both are rooted in finding a likelihood of confusion).

The Sixth Circuit has identified eight factors that are relevant in determining a likelihood of confusion: (1) the strength of the plaintiffs mark; (2) the relatedness of the goods or services offered by the plaintiff and the defendant; (3) the similarity of the marks; (4) any evidence of actual confusion; (5) the marketing channels used by the parties; (6) the probable degree of purchaser care and sophistication; (7) the defendant's intent in selecting its mark; and (8) the likelihood of either party expanding its product line using the marks. *Therma-Scan, Inc. v. Thermoscan, Inc.,* 295 F.3d 623, 630 (6th Cir. 2002). Not all of these factors will be relevant in every case, and in applying them "[t]he ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Id.* at 630 (quoting *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.,* 931 F.2d 1100, 1107 (6th Cir. 1991)). Any doubt as to the likelihood of confusion is resolved against the newcomer. *Giant Food, Inc. v. Nation's Foodservice, Inc.,* 710 F.2d 1565, 1571 (Fed.Cir.1983); *Men of Measure Clothing,* 710 S.W.2d at 47.

**(i) Strength of the mark.** "The strength of a mark is a determination of the mark's distinctiveness and degree of recognition in the marketplace." *Gray v. Meijer, Inc.,* 295 F.3d 641, 646 (6th Cir. 2002). To determine the distinctiveness of a mark, "[t]rademarks are generally categorized as fanciful, arbitrary, suggestive or descriptive" with fanciful and arbitrary being "the strongest or most distinctive marks" and suggestive and descriptive marks being weaker "evoking some quality of the product" or "describ[ing] it directly." *Autozone, Inc. v. Tandy Corp.,* 373 F.3d 786, 794 (6th Cir. 2004)*; see also Champions Golf Club, Inc. v. The Champions Golf Club, Inc.,*

17

78 F.3d 1111, 1116-17 (6th Cir. 1996) (A trademark's strength will fit somewhere on a spectrum ranging from generic, which is entitled to no protection, to arbitrary or fanciful, which is entitled to the highest protection.).

The registration of TTAC's THE TRUTH ABOUT CANCER mark is *prima facie* evidence of the mark's distinctiveness and validity and of TTAC's ownership and exclusive right to use its mark in commerce. 15 U.S.C. § 1115(a); *see also Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1190 (6th Cir. 1988). Moreover, TTAC has spent years developing market recognition of the mark and logo through the publication of books; the creation and release of The Truth About Cancer docuseries; and the promotion of its products and services through interactive social media outlets. As a result, TTAC has gained more than one million followers on Facebook, alone, and a reputation of honesty and integrity amongst its consumer base. TTAC's reputation and goodwill are inseparable from its trademark and logo.

**(ii) Relatedness of the goods and similarity of the marks.** The degree of relatedness between the products and services necessarily depends on the degree of similarity in the competing marks, and vice versa. Thus, "[w]here the goods and services are directly competitive, the degree of similarity of marks needed to cause likely confusion is less than in the case of dissimilar goods or services." Thomas J. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:22 (4th ed. 2005). The Sixth Circuit has described three "categories" in which cases fall, depending on the relatedness of the goods and services: (1) if the parties compete directly or the services are related, then there is a high likelihood of confusion with similar marks; (2) if the services are "somewhat related" but not competitive, then the likelihood of confusion will turn on other factors;

18

and (3) if the services are unrelated, then confusion is highly unlikely. *See Daddy's Junky Music Stores Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 282–83 (6th Cir. 1997).

Here, the parties are direct competitors that market products and information related to cancer and its prevention and treatment. To wit, TATC just released a multi-part docuseries that it promoted and marketed as an updated version of TTAC's docuseries, which, as discussed further herein, has resulted in actual confusion by the consuming public.

"When analyzing similarity, courts should examine the pronunciation, appearance, and verbal translation of conflicting marks." *Daddy's Junky Music Stores,* 109 F.3d at 283. "Where the goods and services are directly competitive, the degree of similarity of marks needed to cause likely confusion is less than in the case of dissimilar goods or services." Thomas J. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:22 (4th ed. 2005).

TATC Publishing, LLC's business name is virtually identical to TTAC Publishing, LLC, and it adopted and continues to use the confusingly similar THE ANSWER TO CANCER mark and logo in its marketing. As former leaders at TTAC, Hunsaker and Goldman had full knowledge of TTAC's federally registered trademark and unregistered logo, which have been in continuous and exclusive use since 2014. Moreover, the undeniably similar mark and logo are far more likely to cause confusion because they are being used on similar products and in the same marketing channels. But there is no better evidence of similarity than a visual comparison of the marks and logos, which are substantially similar:

4830-9230-2794v3
2938205-000015 09/11/2020

 

Indeed, TTAC's confusing mark and logo are designed to benefit TATC at TTAC's expense.

**(iii) Marketing channels and the likely degree of care exercised by purchasers.** "The [marketing channels] factor requires a court to consider the similarities or differences between the predominant customers of the parties' respective goods or services." *Daddy's Junky Music Stores,* 109 F.3d at 285. Moreover, where the parties' products are advertised through the Internet they are in "a marketing channel that increases the likelihood of confusion between the two marks." *PACCAR Inc. v. Telescan Tech. LLC*, 319 F.3d 243, 252 (6th Cir. 2003), *abrogated on other grounds by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004); *see also Brookfield Comm., Inc. v. West Coast Enter. Corp.*, 174 F.3d 1036, 1057 (9th Cir. 1999) ("Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership."). "[I]n assessing the confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." *PACCAR*, 319 F.3d at 253 (citation omitted).

Here, TTAC and TATC both use online marketing channels to advertise their products to the same customer base. Both have dedicated websites, and both promote their products through Facebook, Instagram, and other social media. Moreover, TATC markets its docuseries by expressly referencing TTAC and its docuseries. Because the products are so similar and because the Internet is the main marketing channel, the likelihood of confusion is exacerbated.

20

**(iv) The infringer's intent in selecting the mark.** When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts can presume that the intent was for the public to believe that the infringer's product is actually the product of its competitor. *See PACCAR*, 319 F.3d at 254 ("[T]he use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying.").

Here, there is ample evidence that Defendants intended to copy TTAC's mark and logo. Hunsaker, TTAC's former member and Chief Marketing Officer, and Goldman, TTAC's former "Director of Traffic," formed a competing business one letter transposed from "TTAC Publishing, LLC" little more than a year after leaving, and they used their extensive knowledge of TTAC's operations to adopt a confusingly similar name and logo, produce a copycat product, and market that product through the same marketing channels. This is clear evidence of intent and Defendants certainly intended to derive a benefit from the reputation of TTAC and its mark and logo.

**(v) Likely expansion of product lines.** This factor weighs heavily in favor of finding a likelihood of confusion because the parties are already in direct competition. "[A] strong possibility that either party will expand its business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Daddy's Junky Music Stores*, 109 F.3d at 287 (quotation marks and citation omitted). Here, this has already happened.

TATC was created less than a year ago, and it has already launched a multi-part copycat docuseries that it markets as "version 2.0" of TTAC's docuseries. TATC has already demonstrated that its marketing strategy is to expand its products and services in lock-step with TTAC—letting TTAC expend resources developing products and expanding the market so that TATC can reap

the benefits through copycat products marketed to TTAC's customer base. Only injunctive relief can stop Defendants' infringing actions.

**(vi) Evidence of actual confusion.** To prevail on a request for injunctive relief, plaintiff need only show a likelihood of confusion, not actual confusion. *Frisch's Rest., Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1267 (6th Cir. 1985). In this case, though, there is evidence of actual confusion resulting from Defendants' misconduct, and "[e]vidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Therma-Scan*, 296 F.3d at 634.

Defendants' misleading representations and references to TTAC's products in promoting TATC's docuseries have rippled across the Internet. Now, reviewing websites discuss the two companies as if they are one and consistently frame TATC's docuseries as an expansion or updated version of TTAC's docuseries.[1] If Defendants deny that they directed these reviewers to confuse the two companies, then the reviews are actual evidence of confusion resulting from Defendants' marketing. Moreover, the reviews are exacerbating the confusion. As discussed in Section II.D., *supra*, TTAC has received emails from its customers demonstrating actual confusion. (*See also* Bollinger Aff. ¶ 38 and Ex. K thereto). Consequently, the evidence establishes more than the likelihood of confusion required to obtain injunctive relief.

In sum, all eight factors weigh in favor of TTAC, and TTAC is likely to prevail on the merits of its claims for trademark infringement and unfair competition under both federal and Tennessee law.

---

[1] *See* discussion of reviewing websites and online articles in Section II.D., *supra.*

22

**B.      TTAC Will Suffer Irreparable Harm if a Restraining Order and Injunction Are Not Issued**

A party seeking injunctive relief must show it would suffer irreparable injury absent the relief sought. *Frisch's Rest., Inc.,* 670 F.2d. at 651. Where there is a likelihood of confusion or possible risk to reputation, irreparable harm ordinarily follows as a matter of law, and courts in this Circuit have held that trademark infringement by its very nature is irreparable. *Circuit City Stores, Inc. v. CarMax, Inc.,* 165 F.3d 1047, 1056 (6th Cir. 1999) ("[I]rreparable injury 'ordinarily follows when a likelihood of confusion or possible risk to reputation appears' from infringement or unfair competition." (citation omitted)); *Little Caesar Enters. Inc. v. R-J-L Foods, Inc.,* 796 F. Supp. 1026, 1035 (E.D. Mich. 1992) ("[A] showing of likelihood of confusion simultaneously demonstrates irreparable harm necessary to obtain a preliminary injunction[.]"); *Penthouse Int'l Ltd. v. Penthouse Party and Travel Club Ltd.,* 184 U.S.P.Q. 479, 481 (E.D. Mich. 1974) ("[T]he only irreparable harm the Plaintiff need show is that there is a likelihood of confusion and, therefore, infringement of its mark[.]").

TATC is marketing copycat products to TTAC's customers through the same media channels using an intentionally and deceptively similar mark and logo. As a result, the public is confused as to whether the two companies are the same or affiliated, and TTAC's reputation and goodwill are being harmed every time TATC's mark and logo are viewed by the public. *See Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F. 2d 595, 608 (6th Cir. 1991). ("[I]n the context of an infringement action, 'a finding of irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears.'" (citation omitted)).

More than that, as demonstrated by emails from TTAC's customers, there is actual confusion over whether TTAC and TATC are the same or affiliated. And while TTAC has the

23

opportunity to set the record straight for those customers who inform TTAC of their confusion, given the success of TTAC's docuseries—viewed more than 20,000,000 times—there is no way of identifying which or how many of TTAC's millions of customers and potential customers are also confused but have not expressed their confusion to TTAC. For those customers, TTAC has no way to ensure that it can effectively resolve the confusion. Moreover, TTAC cannot control the quality of TATC's products or the accuracy of the information being disseminated under the infringing mark and logo. As a result, TATC's infringement has a direct impact on TTAC's reputation and goodwill. Consequently, TTAC has no way to ascertain the extent to which its reputation and goodwill are being damaged, and calculating TTAC's actual damages is impossible. An injunction is necessary to prevent any further harm to TTAC.

## C. The Balance of Harms Weighs In Favor of TTAC

The third factor to consider is "whether the issuance of the injunction would cause substantial harm to others." *Tumblebus*, 399 F.3d at 760 (citation omitted). The egregious infringement of TTAC's protected mark and logo and TATC's specific targeting of TTAC's current and potential clients is destroying and will continue to destroy TTAC's hard-earned reputation and goodwill. An injunction is necessary to stop the continued harm—to the extent that stopping it entirely is even possible. And while Defendants have undoubtedly expended considerable time and resources to accomplish their goals, an injunction would not "harm" them because their activities are designed to be unlawful, harmful and destructive. Thus, the harm that TTAC would suffer and is continuing to suffer if an injunction is not issued far outweighs any inconvenience that may be incurred by Defendant in complying with an injunction.

## D. The Public Interest Is Served By Issuing a Restraining Order and Injunction

24

The final factor to consider is whether the public interest would be served by the issuance of the injunction. *Tumblebus*, 399 F.3d. at 760 (citation omitted). "It is well established that trademark law protects not only the private interest of the trademark owner but also the public's interest in not being confused by the infringing products." *Phillip Morris USA, Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1067 (C.D. Cal. 2004) (citing *Inwood Labs., Inc. v. Ives Labs, Inc.*, 456 U.S. 844, 854 n.14 (1982)). "Protecting consumers from false or misleading advertising, moreover, is an important goal of the [Landham Act] and a laudable public policy to be served." *Coca-Cola Co. v. Procter & Gamble Co.*, 822 F.2d 28, 31 (6th Cir. 1987). Here, an injunction would prevent further public confusion and protect the public from TATC's misleading advertising.

## IV.    CONCLUSION

Defendants' continued use of TTAC's confusingly similar mark and logo creates a likelihood of confusion to the public that there is a connection, affiliation, or association between TATC and TTAC and their products. The facts show that Defendants intentionally copied TTAC's business name, registered mark, logo, business model, and marketing strategy to sell a copycat product in the same channels of commerce used by TTAC in order to trade off of TTAC's reputation and goodwill. As a result of Defendants' deceptive and unlawful practices, TTAC has suffered and continues to suffer irreparable harm to its reputation and goodwill.

TTAC has met all requirements for a temporary restraining order and preliminary injunction. Accordingly, TTAC respectfully requests that the Court **GRANT** its Motion for Temporary Restraining Order and Preliminary Injunction and enter the Proposed Temporary Restraining Order submitted herewith and set a hearing to determine whether to issue a preliminary injunction at the earliest possible date.

25

Respectfully submitted this 11th day of September, 2020.

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.

*s/ Anthony F. Schlehuber*
Anthony F. Schlehuber
TN Bar No. 37334
*Counsel for TTAC Publishing, LLC*

211 Commerce Street, Suite 800
Nashville, TN 37208
Telephone: (615) 726- 5600
Facsimile: (615) 726- 0464
Aschlehuber@bakerdonelson.com

L. Clint Crosby
Georgia Bar No. 197877
Phillip Parham
Georgia Bar No. 942874
Ciera N. Locklair
Georgia Bar No. 887772
Monarch Plaza, Suite 1600
3414 Peachtree Road, N.E.
Atlanta, Georgia 30326
404-577-6000 / 404-221-6501 fax
ccrosby@bakerdonelson.com
pparham@bakerdonelson.com
clocklair@bakerdonelson.com

*Counsel for TTAC Publishing, LLC*
*Pro Hac Vice Applications Pending*

## CERTIFICATE OF SERVICE

This will certify service of a copy of the foregoing **PLAINTIFF'S MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** by the CM/ECF online filing system with the U.S. District Court for the Middle District of Tennessee which will automatically send email notification to all counsel of record upon the following. Additionally, the undersigned hereby

26

certifies that a true and exact copy of the foregoing has been served by mail to the following parties as addressed below:

TATC Publishing, LLC
c/o Scott Letourneau
10785 W. Twain Avenue, Suite 229
Las Vegas, NV 89135

Jonathan Hunsaker
1515 Old Alton Road
Argyle, TX 76226

Jeff Hays
2023 Tall Woods Court
Draper, UT 84020

Manny Goldman
58 Frontierland Tail
Ponte Vedra, FL 32081

Patrick Gentempo
1776 Park Avenue, Suite 4-217
Park City, UT 84060

This 11th day of September, 2020.

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.**

*s/ Anthony F. Schlehuber*
Anthony F. Schlehuber
TN Bar No. 37334
*Counsel for TTAC Publishing, LLC*

4830-9230-2794v3
2938205-000015 09/11/2020